945 P.2d 1313

**Robert K. SANDERS, Plaintiff–Appellee,**

**v.**

**Robert FOLEY and Donna Foley, Defendants–Appellants.**

No. 1 CA–CV 96–0522.

Court of Appeals of Arizona, Division 1, Department A.

July 31, 1997.

Review Denied Nov. 12, 1997.

Paul M. Rybarsyk, P.C. by Paul M. Rybar-syk and Owens & Perkins, P.C. by C.D. Owens, Jr., Scottsdale, for Plaintiff–Appellee.

Curtis Ensign, Phoenix, for Defendants–Appellants.

## OPINION

WEISBERG, Judge.

Rob and Donna Foley (collectively, "the Foleys") appeal from a judgment entered in favor of Robert K. Sanders ("Sanders"), a contractor who brought suit against them for sums due under a residential remodeling contract. We consider the following issues:

1. Whether this court lacks jurisdiction because the Foleys failed to commence a timely appeal;

2. Whether the Foleys waived the argument that Sanders could not bring suit because he was not a duly licensed contractor as required by Ariz.Rev.Stat. Ann. (A.R.S.) section 32–1153; and

3. Whether Sanders' Class B–1 General Commercial Contractor's license legally authorized him to engage in residential contracting.

For the following reasons, we reverse.

## FACTS AND PROCEDURAL BACKGROUND

The relevant facts are not in dispute. On May 22, 1993, the parties entered into a contract under which Sanders agreed to remodel portions of the Foleys' residence. At the time, Sanders held a valid Class B–1 General Commercial Contractor license issued by the Registrar of Contractors. Under the contract, the total price for the remodeling was not to exceed $37,000. The Foleys paid Sanders approximately $36,200. Sanders then demanded an additional $30,000 for extra work he allegedly performed pursuant to changes in the contract.

When the Foleys declined to pay, Sanders brought this action for breach of contract or, alternatively, quantum meruit, and to foreclose the mechanic's lien he had recorded against the Foleys' residence. The Foleys counterclaimed for $29,000 in damages for failure to perform the contract in a workmanlike manner, wrongful filing of a lien, consumer fraud, and fraudulent misrepresentation. Most of their claims rested upon the proposition that Sanders was not licensed to do residential contracting.

The Foleys moved for summary judgment on Sanders' complaint, arguing that, under A.R.S. section 32–1153, he was precluded from bringing suit because he was not a licensed residential contractor. Sanders likewise moved for partial summary judgment on the Foleys' counterclaim to the extent that it alleged theories of recovery dependant upon their contention that Sanders was not properly licensed.[1] After briefing and argument, the trial court granted Sanders' motion and denied the Foleys' motion. It ruled that Sanders was properly licensed because his Class B–1 commercial license also authorized residential work.[2]

In the joint pretrial statement, the Foleys did not list Sanders' status as a duly licensed contractor as a contested issue of fact or law. After Sanders rested at trial, the Foleys moved for a directed verdict, arguing that Sanders had failed to prove he was a licensed

---

1. In his summary judgment motion, Sanders admitted that a fact issue remained as to whether he had performed the remodeling "in a workmanlike manner."

2. The minute entry reads in relevant part:

The Court finds that plaintiff had a valid license at the time of the contract herein. Failure to have a license hereafter is not a factor herein.

. . . .

contractor as required by A.R.S. section 32–1153. The trial court denied the motion, stating that, when it previously denied the Foleys' motion for summary judgment, it determined as a matter of law that Sanders was a properly licensed contractor. After submission, the jury found against the Foleys and returned a verdict of $22,454.75 for Sanders.

On May 22, 1996, Sanders' counsel applied for an award of attorneys' fees pursuant to A.R.S. sections 12–341.01 and 33–998. On the same date, he lodged a form of judgment with the trial court which awarded Sanders "the principal sum of $22,454.75 together with pre-judgment interest in the amount of _____, reasonable attorneys' fees of $_____, and costs of $_____."

By minute entry of June 10, 1996, the trial court awarded judgment to Sanders in accordance with the verdict, with $6,184.64 in pre-judgment interest and $339.95 in costs. The trial court further stated:

Plaintiff not having filed an application and affidavit in support of attorney fees, the Court declines to award attorney fees at this time.

The Judgment is signed this date but is *not* filed. It is placed in the division's out box for pick up because counsel failed to provide a Judgment Information Form. (See Rule 3.7 of the Local Rules of Practice for Maricopa County Superior Court).

On appeal, Sanders contends that he supplied the Judgment Information Form when he received the June 10 minute entry. The judgment, signed by the trial judge on June 10, 1996, was filed with the clerk of the superior court on June 18, 1996. The spaces for prejudgment interest and costs were filled in by hand with the sums set forth in the minute entry order of June 10, 1996. The space for attorneys' fees remained blank.

By letter dated June 19, 1996, Sanders notified the trial court that it had been mistaken in believing that Sanders had not filed an application for attorneys' fees. The letter included a copy of the application, and informed the trial court that it had been filed and served on May 22, 1996, and that no opposition had been filed. The letter concluded:

Please review the enclosed Application and Affidavit, and enter an appropriate Order. Because no opposition to the fee request, [sic] I trust that the Court will enter an Order awarding attorneys' fees. Upon notice of the amount of the award, I will submit an amended Judgment for your signature.

The letter was hand-delivered to the trial court and a copy was sent to the Foleys' counsel. Neither the original letter nor a copy was filed directly with the clerk of the superior court.

By minute entry dated June 26, 1996, the trial court ruled as follows:

The Court has received and considered plaintiff's application and affidavit for attorneys fees. No response or objection having been received by the Court, and good cause appearing,

IT IS HEREBY ORDERED awarding plaintiff his attorneys' fees against defendant in the sum of $8,260.00, together with his taxable costs in the sum of $339.95.

On or before July 31, 1996, Sanders' counsel lodged an amended form of judgment.

---

Defendant argues that plaintiff had a B1 commercial license and not a B3 or B4 residential license. Plaintiff argues B1 covers plaintiff's acts herein.

The Court further finds that B1 does not exclude the activities of B3, although a B3 license is more restrictive and precludes the activities of B1. Section B2 of the Administrative Code supports this finding.

From the information now before this Court, the Court must find that the plaintiff was properly licensed and that the plaintiff's lien is valid.

. . . .

IT IS ORDERED DENYING defendant's motion for summary judgment, and

GRANTING plaintiff's motion for summary judgment on the counterclaim in part. Defendant shall have 20 days to amend the counterclaim.

The body of the amended judgment was identical to that entered on June 18, 1996, except that the figures for prejudgment interest, attorneys' fees, and costs were part of the typed text.

The signed amended judgment was filed with the clerk of superior court on August 6, 1996. On September 5, 1996, the Foleys filed a notice of appeal from the amended judgment and the denial of their motions for summary judgment and directed verdict. Sanders has filed a motion to dismiss the appeal for lack of jurisdiction.

## ANALYSIS

### A. MOTION TO DISMISS APPEAL

In his motion to dismiss, Sanders contends that the original judgment entered June 18, 1996, was final and unappealable when no notice of appeal was filed within 30 days of its entry. Sanders concedes that the Foleys timely appealed from the amended judgment, but argues that the appeal must be limited to the only new issue determined by the amended judgment, i.e., the amount of attorneys' fees. Because the Foleys do not challenge the attorneys' fees award in the opening brief, Sanders thus argues that the appeal must be dismissed.

The Foleys respond that the appeal is proper because the trial court could have treated either Sanders' application for attorneys' fees or his letter of June 19, 1996, as a motion to alter or amend the judgment pursuant to Rule 59(*l*). If this is the case, the time for filing a notice of appeal would have commenced to run anew on the entry of the amended judgment. We agree with the Foleys.[3]

Rule 59(a), Arizona Rules of Civil Procedure ("Rule(s)"), permits the court, on motion of the aggrieved party, to vacate a judgment and grant a new trial for any of eight reasons. One of those reasons is an "[a]ccident or surprise which could not have been prevented by ordinary prudence." Ariz. R. Civ. P. 59(a)(3). Further, a trial court may vacate a judgment on grounds provided in Rule 59 regardless of whether a new trial would follow. *See Hegel v. O'Malley Ins. Co.*, 117 Ariz. 411, 412, 573 P.2d 485, 486 (1977). Finally, Rule 59(g) allows the trial court to take such action on its own initiative:

> **On Initiative of Court.** Not later than 15 days after entry of judgment the court of its own initiative may order a new trial for any reason for which it might have granted a new trial on motion of a party.... [T]he court shall specify in the order the grounds therefor.

Sanders' letter of June 19, 1996 informed the trial court that Sanders had filed an application for attorneys' fees and that he would submit an amended form of judgment on receiving notice of the court's ruling on the application. Eight days after entry of judgment, the trial court issued a minute entry indicating that it had received the pending application and granted it in a specific sum. This supplied the only element that had been missing from the original judgment. In this context, we interpret the minute entry as implicitly vacating the original judgment and authorizing an amended judgment with the amount of the attorneys' fees included.

Although the minute entry did not specify the grounds for relief as required by Rule

---

3. The Foleys also argue that we must deny Sanders' motion to dismiss the appeal because there is no evidence in the record that the judgment signed June 10, 1996 was actually filed. Although the original judgment is not listed on the clerk's index and is not among the original documents forwarded to this court as the record on appeal, Sanders' motion to dismiss the appeal supplies us with a copy of the original judgment, signed by the trial judge and file-stamped and certified on June 18, 1996. A properly certified copy of a domestic public record is self-authenti-

cating, Ariz. R. Evid. 902(2), (4), and is not excluded by the hearsay rule, Ariz. R. Evid. 803(8). The Foleys offer nothing to cast doubt on the judgment or its filing, other than its absence from the clerk of superior court's file and index on this appeal. We therefore treat Sanders' attachment of the certified copy to his motion to dismiss as a motion to correct an omission from the record pursuant to Rule 11(e), Arizona Rules of Civil Appellate Procedure, and grant that motion.

59(g), the consequence is not to invalidate the order, but to place on the appellee the burden of convincing this court that the trial court did not err. *See Yoo Thun Lim v. Crespin*, 100 Ariz. 80, 83, 411 P.2d 809, 811 (1966); State Bar Committee Note to 1966 amendment to Ariz. R. Civ. P. 59(g). Here, Sanders has understandably neither appealed nor cross-appealed from the minute entry and does not otherwise attack the amended judgment that followed it. He instead seeks to enjoy all the benefits of the final "amended judgment" while denying the Foleys the opportunity to challenge it on appeal.

Sanders relies upon *Title Ins. Co. v. Acumen Trading Co.*, 121 Ariz. 525, 591 P.2d 1302 (1979). In that case, the trial court granted Acumen's motion for summary judgment, which included a request for attorneys' fees. Acumen immediately filed a motion for an award of attorneys' fees but, the following day, lodged a form of judgment that did not include attorneys' fees. The judgment was signed and entered the same day but did not include Rule 54(b) language. Seventeen days later, the trial court, by minute entry, denied Acumen's motion for fees. Nineteen days thereafter, Acumen filed a motion for new trial and re-award of attorneys' fees. The trial court granted the motion and awarded fees.

The supreme court reversed, holding that the fifteen days for the filing of the new trial motion began to run upon entry of the judgment and the motion was therefore untimely. The court reasoned that the fee request was not a separate, unresolved claim whose presence in the case rendered the judgment non-final absent Rule 54(b) language. *Title Ins.*, 121 Ariz. at 526, 591 P.2d at 1303. The court construed the judgment as having considered and denied the fee motion by implication. The court concluded:

> If Acumen thought the judgment was not justified by the evidence or desired to amend it, a motion for new trial or a motion to amend the judgment should have been filed. 16 A.R.S., Arizona Rules of Civil Procedure, rule 59(d), 59(l), and 52(b).

Both motions *must* be filed within 15 days of the entry of judgment. *See, e.g., Matter of Estate of Balcomb*, 114 Ariz. 519, 562 P.2d 399 (App.1977). Because Acumen's motion for a new trial was filed some 35 days after formal judgment was entered, it was untimely.

*Id.* at 526–27, 591 P.2d at 1303–04.

*Title Ins.*, however, does not support Sanders' motion to dismiss this appeal. Unlike the situation in that case, the trial court here responsed to Sanders' letter by acting on it within fifteen days of the original judgment. The order effectively vacated the original judgment and authorized its re-entry with an award of attorneys' fees, all on the court's own initiative. In contrast, the trial court in *Title Ins.* did not act within fifteen days of the entry of judgment, but instead ruled on an untimely new trial motion.

The same circumstance distinguishes *Mark Lighting Fixture Co. v. General Elec. Supply Co.*, 155 Ariz. 27, 31–32, 745 P.2d 85, 89–90 (1987) (assuming post-judgment motion for attorneys' fees could be treated as a motion to amend the judgment, it was filed on the 28th day after entry of judgment and was therefore untimely), and our recent decision in *Monti v. Monti*, 186 Ariz. 432, 924 P.2d 122 (App.1996) (post-judgment award of attorneys' fees reversed because appellant did not file timely motion to amend or for new trial). Accordingly, we conclude that the Foleys timely appealed from the entire amended judgment.

## B. PRESERVATION OF "PROPER LICENSURE" ISSUE FOR APPEAL

■ Sanders next argues that the Foleys have waived the issue of his status as a duly licensed contractor by failing to: 1) raise the issue in the joint pretrial statement; 2) object to or cross-examine Sanders about his testimony that he was a licensed contractor; 3) present any evidence that Sanders was not properly licensed; 4) argue in a new trial motion that the evidence was insufficient to

show that Sanders was a licensed contractor; or 5) renew their motion for directed verdict at the close of the evidence or by motion for judgment notwithstanding the verdict ("JNOV"). We, however, conclude that this issue has not been waived.

In denying the Foleys' motion for summary judgment, the trial court ruled as a matter of law that Sanders' Class B–1 General Commercial Contractor license necessarily encompassed any work that could be done under a Class B–3 General Remodeling & Repair Contractor license (remodeling or repair of an existing residential structure) or Class B–4 General Engineering Contractor license (construction and repair of appurtenances to residential structures). *See* Arizona Admin. Code ("A.A.C.") R4–9–103. The trial court found "that [Sanders] had a valid license at the time of the contract herein. Failure to have a license hereafter is not a factor herein." The trial court did not determine that genuine issues of material fact remained, but rather denied the Foleys' motion and granted Sanders' motion.

Because the license issue was resolved by summary judgment as a matter of law, the Foleys' failure to list it as a contested issue for trial was not improper. The same is true of their lack of objection to, or cross-examination of, Sanders' testimony, and their failure to attack the sufficiency of the licensing evidence in a motion for new trial. Further, when the Foleys moved for a directed verdict at the close of Sanders' evidence, the following occurred:

> The Court: My understanding is that Judge Hutt previously had found as a matter of law that he was, in fact, a registered contractor at this time, is that correct?
>
> Mr. Rybarsyk: Yes.
>
> The Court: All right. I think that's part of the proof, and I think that she has made that finding. I don't think that's something that the jury needs to deliberate about.
>
> And secondly, there has been no question, I mean, that's jurisdictional. So, it is real-

ly a legal finding, and I don't see any reason at this point why we would need to have—or why that would in any way entitle you to a directed verdict on that issue.

> Therefore, motion is denied.

Because the issue had already been decided as a matter of law, the Foleys' motion for directed verdict served no purpose. Under these circumstances, the Foleys' failure to renew the motion at the close of evidence or in a motion for JNOV cannot be interpreted as a waiver of the issue on appeal. *Cf. Standard Chartered PLC v. Price Waterhouse,* 190 Ariz. 6, 26–29, 945 P.2d 317, 337–340 (App.1996) *petition and cross petition for review pending,* (failure to challenge by motion for directed verdict a prior determination of law unrelated to sufficiency of evidence does not preclude later reassertion of the challenge by motion for judgment notwithstanding the verdict). We therefore conclude that the Foleys have preserved this issue for appeal.

## C. SUFFICIENCY OF GENERAL COMMERCIAL CONTRACTOR'S LICENSE

A.R.S. section 32–1153 provides that no contractor may bring suit to collect compensation for performing work that requires a contractor's license unless the contractor was properly licensed when entering the contract:

> No contractor as defined in § 32–1101 shall act as agent or commence or maintain any action in any court of the state for collection of compensation for the performance of any act for which a license is required by this chapter without alleging and proving that the contracting party whose contract gives rise to the claim was a duly licensed contractor when the contract sued upon was entered into and when the alleged cause of action arose.

The Foleys argue that the trial court erred in determining that Sanders' Class B–1 General Commercial Contractor license permit-

ted him to bring the instant action for work done on the Foleys' residence as a "duly licensed contractor." They maintain that a Class B–1 license authorizes its holder to engage only in commercial construction, not residential.

In response, Sanders argues that the scope of a Class B–1 General Commercial Contractor license permits its holder to perform both residential and commercial contracting duties. We disagree.

The governing statutes require that contracting license classifications for residential and nonresidential work be mutually exclusive. At the time the parties entered into the contract, A.R.S. section 32–1102[4] provided in part:

> For the purpose of license classification, the contracting business shall include:
>
> 1. General building contracting which is engaging in the contracting business **other than residential contracting** in connection with any structure built, being built or to be built for the support, shelter and enclosure of persons, animals, chattels or movable property of any kind requiring in its construction the use of more than two unrelated construction trades or crafts....
>
> ....
>
> 3. Residential contracting which is engaging in the contracting business by any general contractor or subcontractor who undertakes to construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any residential structure or appurtenances including swimming pools on or within residential property lines as defined in § 32–1101.

(Emphasis added.) Thus, A.R.S. section 32–1102 explicitly excludes residential contracting from the scope of a general building contracting license.

The mutually exclusive nature of general commercial and residential licenses is also evidenced by the statutory bonding and funding requirements for each. All contracting licensees must provide surety bonds or cash deposits as provided by A.R.S. section 32–1152. The required amounts for "residential" contractors are governed by A.R.S. section 32–1152(B)(5) through (7). The required amounts for "general" contractors, "specialty" contractors, and applicants "for licenses under both residential and commercial classifications" with overall annual construction work volume of $350,000 or less are governed by A.R.S. section 32–1152(B)(1) through (4).

Residential contractors must also furnish an additional bond or cash deposit of $100,000 to cover actual damages suffered by residential real property owners and others as defined in A.R.S. section 32–1131(3) or pay assessments toward the residential contractors' recovery fund established under A.R.S. section 32–1132. See A.R.S. § 32–1152(C). Nonresidential contractors have no similar obligations. We therefore conclude that the contracting statutes clearly indicate that a general commercial contracting license does not authorize residential contracting.

Sanders' argument to the contrary is based solely upon his interpretation of the Registrar of Contractors' administrative regulations. We, however, find the regulations to be consistent with the statutes.

Sanders relies upon the scope provision for the B–1 license found in A.A.C. R4–9–102:

**B–1 GENERAL COMMERCIAL CONTRACTOR**

> Construction, alteration, and repair in connection with any structure built, being built or to be built for the support, shelter and enclosure of persons, animals, chattels or movable property of any kind requiring in its construction the use of two or more than two unrelated construction trades or crafts, or to do or superintend the whole or any part thereof which includes the management or

4. An amended version of the statute became effective July 20, 1996. See 1996 Ariz. Sess. Laws ch. 176, § 2.

direct or indirect supervision of any work performed.

Excluded are electrical, plumbing, mechanical, boilers, swimming pools and spas, which must be subcontracted to an appropriately licensed contractor.

Sanders compares this provision with the scope provision for the B license in R4–9–103:

B GENERAL BUILDING CONTRACTOR

Construction of all or any part of a residential structure or appurtenance, except for electrical, plumbing, mechanical, boilers, swimming pools or spas, which must be subcontracted to an appropriately licensed contractor.

Sanders reasons that:

Under Arizona's Administrative Code, as presented to the trial Court and argued to the trial Court, a holder of a B–1 license was allowed to construct and/or repair any structure built for the support, shelter or enclosure of persons. The FOLEY's home was a structure built for the support, shelter and enclosure of persons, i.e., the FOLEYs. By definition, SANDERS was properly licensed to perform the remodeling of the FOLEY's residence.

SANDERS' counsel argued to the trial Court that he was properly licensed to build the downtown courthouse, but according to the Defendants, he was not qualified to add a bedroom to their home. The Defendants' position was, and is, untenable.

A broader view of A.A.C. R4–9–102 and R4–9–103 belies Sanders' reasoning. A.A.C. R4–9–102 is entitled **"Commercial classifications and scopes,"** [5] and is divided into two subsections. Subsection A begins: "Commercial license classifications. License classifications for commercial contractors are as follows:...." What follows is three license groups, Engineering Construction, un-

der which fifteen license classifications are each named and designated by "A-__"; General Commercial Construction, under which three license classifications are each named and designated by "B-__"; and Specialty Commercial Contractors, under which 47 license classifications are each named and designated by "L-__".

Subsection B of A.A.C. R4–9–102 begins: "Commercial scopes. The scope of work which may be done under the classifications shown is as follows:...." Six pages of separate paragraphs follow, each defining the scope of a license classification listed under subsection A. One of these paragraphs is the one quoted above for "B–1 General Commercial Contractor." In the overall context of A.A.C. R4–9–102, though, it is not surprising that the defined scope of the B–1 license does not explicitly contain a limitation to commercial projects because that limitation is implicit throughout A.A.C. R4–9–102.

Moreover, the fact that the defined scope of the B license in R4–9–103 is explicitly limited to residential contracting does not require a different conclusion. The structure of A.A.C. R4–9–103 is less tightly organized than that of A.A.C. R4–9–102. Its heading is simply **"License Classifications."** Some of the licenses it classifies are restricted to residential projects by the terms of their definitions, including "B General Building Contractor," "B–3 General Remodeling & Repair Contractor," "B–4 General Engineering Contractor," and "C–6 Swimming Pool Service & Repair." Others are not expressly limited to residential projects, but have direct or indirect analogs under the commercial license classifications of A.A.C. R4–9–102: for instance "C–3 Awnings and Canopies" ("L–3 Awnings, Canopies, Carport and Patio Covers"); "C–15 Blasting" ("A–3 Blasting"); and "C–42 Roofing" ("L–42 Roofing").

All the classifications listed in A.A.C. R4–9–103 appear to fall into one of these two informal categories. This structure clearly indicates that A.A.C. R4–9–103, although

---

5. A.A.C. R4–9–101(F) provides, "Commercial Construction: Includes industrial and public works projects and all nonresidential construction."

more loosely drafted than A.A.C. R4–9–102, is intended to collect and classify only residential contracting licenses.

Thus, the explicit restriction to "residential" construction in the A.A.C. R4–9–103 scope definition for Class B "General Building Contractor" is in keeping with the less disciplined structure of that provision overall. Comparing it to the scope definition for Class B–1 "General Commercial Contractor," in which an express restriction to "commercial" projects would have been superfluous in the context of A.A.C. R4–9–102, does not support Sanders' argument that a Class B–1 license permits residential contracting.

We, accordingly, conclude that Sanders' Class B–1 license did not authorize him to engage in residential contracting. Therefore, pursuant to A.R.S. section 32–1153, he was not a "duly licensed contractor" entitled to collect compensation from the Foleys. *See Schlicht v. Curtin,* 117 Ariz. 30, 570 P.2d 801 (App.1977). Consequently, he was neither entitled to enforce the contract nor record a mechanic's lien against the Foley's residence. *See* A.R.S. § 33–981(C).

## D. REMAINING CLAIMS

The trial court granted summary judgment for Sanders on the counts of the Foleys' counterclaim that depended on Sanders not being properly licensed and the Foleys have not challenged that ruling on appeal. The jury also found against the Foleys on the remaining count of the counterclaim and the Foleys have similarly failed to make any argument challenging that portion of the verdict. We, therefore, leave these matters undisturbed.

Finally, Sanders' count for recovery in quantum meruit was not a separate claim from the breach of contract, but rather an alternative theory advanced in support of his single damages claim. *Davis v. Cessna Aircraft Corp.,* 168 Ariz. 301, 812 P.2d 1119 (App.1991). A.R.S. section 32–1153 clearly precludes any recovery under quantum meruit.

## E. ATTORNEYS' FEES

The Foleys request an award of attorneys' fees incurred in the trial court and on appeal pursuant to A.R.S. sections 12–341.01(B) and 33–998(B). Because the award of fees incurred at trial lies within the discretion of the trial court, we remand for that determination. With respect to fees on appeal, we grant the request, pending the Foleys' compliance with Rule 21, Arizona Rules of Civil Appellate Procedure.

## CONCLUSION

For the foregoing reasons, we reverse and remand with directions to enter judgment for the Foleys in accordance with this opinion, and determine an appropriate award of attorneys' fees.